Clinton M. **LAWRENCE,** Plaintiff,

v.

**FINCH PRUYN & COMPANY, INC.,** Defendant,

**FINCH PRUYN & COMPANY, INC.,** Third–Party Plaintiff,

v.

**ALLWASTE ENVIRONMENTAL SERVICES/North Atlantic, Inc.,** Third–Party Defendant.

94–CV–271.

United States District Court, N.D. New York.

July 7, 1995.

Rowley, Forrest, O'Donnell Beaumont & Pelersi, P.C., Albany, NY, for plaintiff; Brian J. O'Donnell, David P. Miranda, of counsel.

Carter, Conboy, Case, Blackmore Napierski & Maloney, P.C., Albany, NY, for defendant, Finch Pruyn & Co. Inc.; James A. Resila, of counsel.

Ainsworth, Sullivan, Tracy, Knauf, Warner & Ruslander, Albany, NY, for Third–Party defendants, Allwaste Environmental Services/North Atlantic, Inc.; Michael J. Murphy, of counsel.

### MEMORANDUM DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. *Introduction.*

Plaintiff, Clinton Lawrence ("Lawrence"), commenced this action against defendant, Finch Pruyn & Company, Inc. ("Finch

Pruyn"), alleging violations of Labor Law §§ 200, 240 and 241, as well as state law causes of action for negligence and nuisance.[1] Finch Pruyn then brought action against third-party defendant, Allwaste Environmental Services/North Atlantic, Inc. ("Allwaste").

Both Lawrence and Finch Pruyn moved for summary judgment on the deadline for filing of dispositive motions set out by the Pretrial Scheduling Order as amended on March 1, 1995. Plaintiff seeks partial summary judgment on the issue of liability for his claim under Labor Law § 240(1). Finch Pruyn seeks dismissal of all plaintiff's claims. Allwaste did not join in or oppose either motion. Oral argument was heard on May 25, 1995, in Utica, New York.

## II. *Facts.*

Lawrence was employed by Allwaste as an industrial cleaner. In the fall of 1993, Finch Pruyn and Allwaste entered into a contract where Allwaste would undertake the cleaning of the premises known as the Finch Pruyn Paper Mill, located in Glens Falls, New York. This included a special project entailing the hydroblasting of built up slag on the inside walls of the No. 6 I.D. fan.[2] Lawrence claims that on November 3, 1993, he entered the fan chamber and began hydroblasting the slag away from the walls. He claims that a large piece of slag was dislodged from above him.[3] It fell on him and caused him to lose control of the hydroblaster. The force of water came down across his foot and caused severe injury.

Lawrence claims that Finch Pruyn was obligated to provide some form of protective net or cover, placed above him to protect him from just such an occurrence, and that he should have been required to wear metatarsal protection to prevent his injuries.

## III. *Discussion.*

A motion for summary judgment may be granted only when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, Partnership v. Medfit Int'l, Inc.*, 982 F.2d 686, 689 (1st Cir.1993); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). In other words, a motion for summary judgment pursuant to Fed.R.Civ.P. 56 shall be granted only "when the pleadings, evidence obtained through discovery, and affidavits show that there is no genuine issue as to any material fact." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991).

"Ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion." *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir. 1983). "The judge's function is not ... to weigh the evidence and determine the truth of the matter," *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), such "is the prerogative of the finder of fact." *Murphy v. Provident Mutual Life Ins. Co.*, 923 F.2d 923, 930 (2d Cir.1990) (Kearse, J., dissenting), *cert. denied*, 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991). Rather, the judge's role is "to determine whether there does indeed exist a genuine issue for trial." *Liberty Lobby*, at 249, 106 S.Ct. at 2510.

1. The cause of action alleging nuisance has been withdrawn.

2. The No. 6 I.D. fan or induced draft fan, was deployed to protect a boiler which produced steam acid when operated. The fan pulled flue gases away from the boiler to prevent buildup of these toxic incendiary fumes. The fan's housing is a ten by twelve foot room with an eight foot ceiling that leads to a flue that runs approximately thirty feet upward to exhaust the fumes. As flue gases travel through the fan housing they cause a build-up on the walls of an ash deposit known as slag.

The hydroblaster used by Lawrence was basically a water hose with a two foot long nozzle or barrel at the end that emitted several tons of concentrated water pressure that would literally cut away the cement-hard slag from the walls of the fan.

3. It is not clear whether the chunk of slag fell from the walls of the flue or from the ceiling of the fan housing chamber. It is also unclear whether the slag hit him on the hard hat and shoulder or whether the slag hit the hydroblaster barrel directly. However that is of no concern.

### A. *Plaintiff's Claim of a Violation of Labor Law 240(1) against Finch Pruyn.*

Labor Law § 240(1) imposes absolute liability on owners, contractors, and agents for failing to provide adequate safety devices. N.Y.Lab.Law § 240(1) (McKinney 1986).[4] New York's Court of Appeals explained the reach of the statute, stating:

> [S]ection 240(1) imposes absolute liability on owners, contractors and their agents for any breach of the statutory duty which has proximately caused injury. The duty imposed is 'nondelegable and . . . an owner is liable for a violation of the section even though the job was performed by an independent contractor over which it exercised no supervision or control.'

*Gordon v. Eastern Ry. Supply, Inc.*, 82 N.Y.2d 555, 559, 606 N.Y.S.2d 127, 129, 626 N.E.2d 912, 914 (1993) (quoting *Rocovich v. Consolidated Edison Co.*, 78 N.Y.2d 509, 513, 577 N.Y.S.2d 219, 221, 583 N.E.2d 932, 934 (1991)). Here, Finch Pruyn contracted with Allwaste for the industrial cleaning of the No. 6 I.D. fan housing. It is of no consequence then, whether Finch Pruyn did or did not supervise the work or direct the manner in which the work was to be performed. Furthermore, § 240(1) precludes any defense that the injured worker was contributorily negligent. *Stolt v. General Foods Corp.*, 81 N.Y.2d 918, 920, 597 N.Y.S.2d 650, 651, 613 N.E.2d 556, 557 (1993). "[Finch Pruyn's] status as owner, alone is enough to impose liability and grant summary judgment." *Novak v. BASF Corp.*, 869 F.Supp. 113, 117 (N.D.N.Y.1994).

However, while § 240(1) offers little or no escape from the constricting grip of liability upon owners and contractors once it takes hold,[5] its application is called for under only very limited circumstances. The New York Court of Appeals, referring to this statute as the "scaffold law," *Gordon*, 82 N.Y.2d at 559, 606 N.Y.S.2d at 129, 626 N.E.2d at 914, explained that the section "was intended to apply where there are 'risks related to elevation differentials.' " *Id.*, at 561, 606 N.Y.S.2d at 130, 626 N.E.2d at 915 (quoting *Rocovich*, 78 N.Y.2d at 514, 577 N.Y.S.2d at 222, 583 N.E.2d at 935).

Lawrence could allege that he was injured while working on an elevated surface (he was inside the fan housing when the accident occurred; this area can be viewed as a surface above ground level although this point is disputed by Finch Pruyn). He was involved in the "repairing, . . . [or] cleaning . . . of a building or structure." N.Y.Lab. Law § 240(1). However, the fan housing was not a surface "furnished or erected . . . for the performance of such labor." Id. Nor was it a "scaffolding, hoist, stay, [or] ladder." Id. Nor was the falling debris caused by "hoists, stays, . . . slings, hangers, blocks, pulleys, braces, irons, ropes or other devices which [were required to] be so constructed, placed and operated so as to give proper protection." Id.

The Court of Appeals in *Rocovich*, 78 N.Y.2d 509, 577 N.Y.S.2d 219, 583 N.E.2d 932, spoke of "special hazards" from which this statute was intended to protect workers. *Rocovich*, 78 N.Y.2d at 514, 577 N.Y.S.2d at 222, 583 N.E.2d at 935. The Court of Appeals clarified what was meant by "special hazards" in the case of *Ross v. Curtis–Palmer Hydro–Elec. Co.*, 81 N.Y.2d 494, 601 N.Y.S.2d 49, 618 N.E.2d 82 (1993).

> The 'special hazards' to which we referred in *Rocovich*, however, do not encompass *any and all* perils that may be connected in some tangential way with the effects of

---

4. Subdivision one states in part:

All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes and other devices which shall be so constructed, placed and operated so as to give proper protection to a person so employed.

N.Y.Lab. Law § 240(1) (McKinney 1986).

5. Defendants hold a limited defense referred to as the "recalcitrant worker" defense, which is only valid where the worker refused to use an available safety device. *Hagins v. State*, 81 N.Y.2d 921, 597 N.Y.S.2d 651, 613 N.E.2d 557 (1993).

gravity. Rather, the 'special hazards' referred to are limited to such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured. In other words, Labor Law § 240(1) was designed to prevent those types of accidents in which the scaffold, hoist, stay, ladder or other protective device proved inadequate to shield the injured worker *from harm directly flowing from the application of the force of gravity to an object or person.*

*Id.,* at 501, 601 N.Y.S.2d at 52–53, 618 N.E.2d at 85–86 (emphasis in original).

The Fourth Department in the case of *Staples v. Town of Amherst,* 146 A.D.2d 292, 540 N.Y.S.2d 926 (4th Dep't 1989), applied the "falling worker or object" test in dismissing a claim under Labor Law § 240(1).[6] Staples, a laborer at a construction site owned by the defendant, was involved in the excavation beneath a street for the replacement of a sewer line. He and other workers were in the process of shoring up the walls of a ten to twelve foot deep trench when the walls caved in on them. The court in finding summary judgment for the defendant, stated that liability under this section will only lie "upon a showing that the injured worker fell from an elevated work surface or was struck by an object falling from an elevated work surface." *Id.,* at 293, 540 N.Y.S.2d at 927.

Lawrence's claim under § 240(1) presents a similar factual scenario to that of *Staples.* Since plaintiff was not injured in a fall, the question asked is whether an object fell from an elevated work surface. In cleaning and cutting away the slag of the No. 6 I.D. fan, as with the cave-in involved in *Staples,* an object fell to the work site from above. However,

in neither case did the object fall from the work site. Furthermore, neither case involves an unsecured hoist, inadequate scaffold, stay or ladder, or an object falling as a result of any elevated maneuver. *See Ross,* 81 N.Y.2d at 501, 601 N.Y.S.2d at 53, 618 N.E.2d at 86. Plaintiff performed all the hydroblasting activity at shoulder level and below. Whether this work site activity caused loosening of materials from above is not dispositive as the result *Staples* attests to.

Plaintiff attempts to satisfy § 240's varied requirements by pointing to both an elevated work site and a falling object. However, his attempt remains too disjointed to satisfy the "falling worker or objects" test. *See also Oakes v. Niagara Mohawk Power Corp.,* 176 A.D.2d 1240, 576 N.Y.S.2d 472 (4th Dep't 1991); *and Shaffer v. Niagara Mohawk Power Corp.,* 167 A.D.2d 824, 561 N.Y.S.2d 862 (4th Dep't 1990).

Section 240(1) fails to reach this unfortunate occurrence and will not protect Lawrence.

## B. *Plaintiff's Claim of a Violation of Labor Law § 241(6) against Finch Pruyn.*

Lawrence alleges a violation of Labor Law § 241(6). This section "imposes a non-delegable duty upon owners and contractors to provide reasonable and adequate protection and safety to construction workers." *Giambalvo v. National R.R. Passenger Corp.,* 850 F.Supp. 166, 170 (E.D.N.Y.1994). Section 241(6) states in part:

6. All areas in which construction, excavation or demolition work is being per-

---

6. The Fourth Department developed this test prior to the New York Court of Appeals decision in *Ross.* While the Third Department criticized the Fourth Department's application of the "falling worker or object" test when it decided *Ross* (*see Ross v. Curtis–Palmer Hydro–Elec. Co.,* 180 A.D.2d 385, 389, 585 N.Y.S.2d 516, 519 (3d Dep't 1992), it is apparent from the Court of Appeals language in *Ross* (the appeal of that Third Department case), that the test weathered the storm to remain valid law. *Compare Ross,* 81 N.Y.2d at 501, 601 N.Y.S.2d at 53, 618 N.E.2d at 86 ("Labor Law § 240(1) was designed to pre-

vent those types of accidents in which the scaffold, hoist, stay ladder or other protective device proved inadequate to shield the injured worker from harm directly flowing from the application of the force of gravity to an object or person") *with Staples,* 146 A.D.2d at 296, 540 N.Y.S.2d at 929 (quoting *Siragusa v. State of New York,* 117 A.D.2d 986, 987, 499 N.Y.S.2d 533, 534 (4th Dep't), *leave denied* 68 N.Y.2d 602, 505 N.Y.S.2d 1026, 496 N.E.2d 239 (1986)) ("The statute is addressed to situations in which a worker is exposed to the risk of falling from an elevated work site or being hit by an object falling from an elevated work site.")

formed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work ... shall comply therewith.

N.Y.Lab.Law § 241(6) (McKinney's supp. 1994). Defendant argues that this section should not apply to plaintiff's accident. Hydroblasting, defendant claims, did not entail construction, excavation, or demolition—the only three enumerated activities of the section—and as such would not fall under this section.

The District Court in *Giambalvo* took note of the statute's provision for the commissioner to make rules to carry out § 241(6), and that such rules included Industrial Code Rule No. 23 which defines "construction work." *Giambalvo*, 850 F.Supp. at 170. A review of Industrial Rule No. 23 reveals a considerable broadening of the scope of § 241(6). It defines construction work in part as:

> All work of the types performed in the construction, erection, alteration, repair, maintenance, painting or moving of buildings or other structures, ... and includes, by way of illustration but not by way of limitation, the work of hoisting, land clearing, earth moving, grading, excavating, trenching, pipe and conduit laying, road and bridge construction, concreting, cleaning of the exterior surfaces including windows of any building or other structure under construction, equipment installation and the structural installation of wood, metal, glass, plastic, masonry and other building materials in any form or for any purpose.

12 N.Y.C.R.R. 23–1.4(13).[7] The hydroblasting of the interior surfaces of the No. 6 I.D. fan surely fell within this far reaching definition. The task fits the mold of either a maintenance or cleaning project—both covered by the Industrial Code definition. As such, § 241(6) protects the activity allegedly responsible for plaintiff's injuries, and plaintiff's claim for relief under § 241(6) remains viable.

### C. *Plaintiff's Claim of a Violation of Labor Law § 200 against Finch Pruyn.*

Plaintiff claims that the defendant was negligent in providing him with a safe place to work, and is liable under New York Labor Law § 200 for such negligence. The legislative history of the statute identifies it as "a codification of the existing common law duty to protect the health and safety of employees, not to create a new obligation." *In Re Joint Eastern & Southern Dist. Asbestos Litig.*, 827 F.Supp. 1014, 1052–53 (S.D.N.Y.1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124 (2d Cir.1995). "[W]here such a claim arises out of alleged defects or dangers arising from a subcontractor's methods or materials, recovery against the owner or general contractor cannot be had unless it is shown that the party to be charged exercised some supervisory control over the operation." *Ross*, 81 N.Y.2d at 505, 601 N.Y.S.2d at 55, 618 N.E.2d at 88. Since plaintiff seeks recovery from the owner, Finch Pruyn, for "defects or dangers arising from a subcontractor's [Allwaste] methods or materials," *id.*, direction or control must be established.

Finch Pruyn argues that it exercised no control over the work of hydroblasting the inner workings of the I.D. fan. Defendant notes that plaintiff entered the fan alone, with only one other person watching—also an Allwaste employee. Defendant argues that no Finch Pruyn employee exercised any supervision or control of the cleaning procedure. It is pointed out that all inspection and operation was performed exclusively by Allwaste with all equipment supplied by them as well.

However, plaintiff counters that Finch Pruyn not only had the authority, but the obligation to oversee admission of personnel into the fan chamber, as well as the equip-

---

**7.** State courts have also held that the Industrial Code may be referenced in interpreting the statutory language of § 241(6). *DaBolt v. Bethlehem Steel Corp.*, 92 A.D.2d 70, 74, 459 N.Y.S.2d 503, 506 (4th Dep't 1983).

ment brought in with them. Several Finch Pruyn employees acted as entry supervisors to oversee such admission.[8] Finch Pruyn even provided a confined space entry permit qualifying the safety of the interior of the fan for the Allwaste workers.[9] Accordingly, there is evidence that defendant may have exerted some form of control over the site and the activities in question. Plaintiff's claims under New York Labor Law § 200 and negligence must therefore remain.

## IV. *Conclusion.*

Accordingly, it is

ORDERED that:

1. Defendant Finch Pruyn's motion for summary judgment is **GRANTED** in part, dismissing those parts of plaintiff's first cause of action under Labor Law § 240(1), dismissing plaintiff's second cause of action for nuisance, and dismissing plaintiff's fourth cause of action under Labor Law § 240(1); and the remainder is **DENIED;** and

2. Plaintiff's motion for partial summary judgment on the issue of liability under Labor Law § 240(1) is **DENIED.**

IT IS SO ORDERED.

---

8. Werner Bloomfield testified in his deposition as follows:
Q. Do you know if an entry supervisor has any other responsibilities or duties?
A. Keeps track of people going in and out of the confined space.
Q. And in what manner does an entry supervisor keep track of people going in and out of a confined space?
A. You have to sign a sheet. Entrants have to sign. . . .
Q. Do you know who Finch Pruyn entry supervisors were for the power plants in November of 1993?
A. Richard DeMarsh signed on.
Q. Any others that you are aware of?
A. Tom Condon.
(Dep. of Werner Bloomfield, Def.Mot.Ex. "C" at pp. 29–32).

9. The following deposition excerpt explains:
Q. Do you know what "permit required confined space" is?
A. Yes.

Q. And what is your understanding of what a "permit required confined space" is?
A. Confined space is one entrance to the space. One entrance, one exit. That's all it is.
Q. Do you know if the No. 6 I.D. fan was considered a permit required confined space in November 1993?
A. Yes.

.   .   .   .   .

Q. Did Finch Pruyn have any type of procedure that was required that needed to be gone through before entry could be obtained into the No. 6 I.D. fan?
A. Vessel entry procedure.
Q. And what is your understanding of the vessel entry procedure that Finch Pruyn had?
A. Test in air quality before entering equipment.
(Dep. of Werner Bloomfield, Def.Mot.Ex. "C" at pp. 22–24).